UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CITIZENS & NORTHERN BANK,

                                              Plaintiff,

                           -vs-

PEMBROOK PINES MASS MEDIA, N.A., CORP., and
ROBERT J. PFUNTNER,

                                              Defendants.

DECISION & ORDER

09-CV-6385-CJS

_____

**APPEARANCES**

For Plaintiff:                           Angela Z. Miller, Esq.
                                       William H. Baaki, Esq.
                                       Keith M. Brandofino, Esq.
                                       Phillips Lytle LLP
                                       3400 HSBC Center
                                       Buffalo, NY 14203
                                       (716) 847-7060

For Defendants:                       Camille W. Hill, Esq.
                                       Stephen A. Donato, Esq.
                                       Bond, Schoeneck & King
                                       One Lincoln Center
                                       Syracuse, NY 13202
                                       (315) 218-8627

For the Receiver:                   C. Bruce Lawrence, Esq.
                                       Boylan Code
                                       Culver Road Armory
                                       Rochester, NY 14620
                                       (585) 232-5300

**INTRODUCTION**

**Siragusa, J.** This matter is before the Court on a motion by the Court-appointed Receiver Richard A. Foreman for an Order:

(1) Approving payment of $104,182.08 for reimbursement of expenses for services rendered between March 1, 2012, and September 30, 2012 ("First Interim Period");

(2) Approving the payment of any additional fees incurred by the Receiver in excess of the monthly budgeted allowance of $4,405.19; and

(3) Approving a brokerage fee of $50,000 for Richard A. Foreman Associates.

*See* Proposed Order, filed October 19, 2012, ECF No. 99-4. In addition to the October 19 motion, the Receiver filed another motion on May 14, 2013, ECF No. 121, seeking the following:

(i) the fees, costs and expenses previously paid by the Receiver and reported in the Receiver's Reports, #3 through 10, inclusive;

(ii) the overage previously approved by this Court in the amount of $4,405.19; and

(iii) the brokerage fee of $50,000 incurred by the Receiver upon the Consultant's being the procuring cause of the Stalking Horse purchasers for the Receivership Assets and the execution of definitive agreements among the Receiver as Seller and the Stalking Horse Bidders as Buyers, which Agreements were approved by this Court; and

(iv) granting such other and further relief as is just and proper.

Final Application of Richard A. Foreman as Receiver for Approval of Interim Compensation and Allowance of Additional Compensation and Reimbursement of Expenses ("Final Application") at 7, May 14, 2013, ECF No. 121.

Defendants filed papers on October 19, 2012, opposing only the brokerage fee of $50,000, arguing that the fee is not due and payable under the terms of the brokerage agreement and that Richard A. Foreman Associates has already been fully compensated

for its efforts in connection with the proposed sale of the Pembrook radio station assets. Defendants further maintain they are not parties to the brokerage agreement and the fee may not be paid from the funds deposited by Defendants with the Court[1] to satisfy the judgment in this case. Hill Decl. ¶ 2, Oct. 19, 2012, ECF No. 100. The Receiver filed a reply on November 7, 2012, ECF No. 108. For the reasons stated below, Mr. Foreman's request for a brokerage fee of $50,000 is denied, but his applications are granted in all other respects.

**BACKGROUND**

The Court will presume familiarity with the facts of this case, and will only outline briefly the background and discuss only the documents relevant to the issue of whether a brokerage fee is due and payable.

Plaintiffs commenced this case in 2009 seeking a judgment against Defendants in the amount of $244,554.61, plus late fees, costs, attorney fees and interest. Compl. at 11, Jul. 30, 2009, ECF No. 1. Defendants defaulted, and the Court entered judgment. Judgment, Sept. 17, 2010, ECF No. 7. Plaintiffs attempted to negotiate with Defendants for payment, but those discussions proved unfruitful. Defendants realized that since, the property against which the judgment could be executed involved licensed radio stations, they needed a Receiver who was familiar with, and could satisfy the requirements of the Federal Communications Commission ("FCC") to run the station while seeking a buyer. Thus, the Court appointed a receiver with credentials to satisfy the FCC requirements and who had the ability to seek a purchaser of the radio stations in order to satisfy the

---

[1] Although Defendants do not oppose payment of Mr. Foreman's expenses, they argue that those payments should be made from operating account of Pembrook Pines Mass Media, N.A., Corp.

judgment.

In its Order filed on March 1, 2012, ECF No. 21, the Court appointed Richard A. Foreman, as Receiver, to perform, *inter alia*, the following essential functions:[2] (1) serve as Receiver over the assets designated in the Order; (2) use, lease, sell and convert in to money those assets in either a private or public sale, seeking Court approval of all leases and sales of property having a value of $100,000 or more; and (3) pay himself fees and expenses out of the proceeds of up to $17,500 per month. The Order further stated that to the extent that fees and expenses, subject to an accounting and final approval by the Court, could not be paid from operating funds, "Defendants are jointly and severally liable for the reasonable costs, fees and expenses of the Receiver incurred in connection with the performance of his duties as described [in this Order]...."

In its Amended[3] Order Approving Sale and Bidding Procedures, filed on August 24, 2012, ECF No. 72, the Court approved Mr. Foreman's sale and bidding procedures with respect to sale of the radio stations and set a sale date of September 27, 2012 at 2:30 PM. In his moving papers, Mr. Foreman proposed to sell the radio stations in a manner designed to maximize their value to a buyer at a minimum purchase price of $510,000 for the Bath stations, to require the successful bidder to submit an application to

---

[2] The Order is significantly more complex than the Court's brief summarization here, but these were the essential functions required of the receiver. It was not until later that the Court authorized the Receiver to find purchasers. At first, his primary role was to take over the radio stations and ensure their continued operation. Thus, the Receiver had to be an individual qualified under the FCC's rules to be a commercial radio station licensee. Subsequently, on April 17, 2012, ECF No. 41, the Court also appointed Mr. Foreman as Receiver over the individual defendants' assets. The terms of that order echoed the terms of the first order, except that the compensation authorized for fees and expenses could not exceed $3,000 per month.

[3] Although titled as "Amended," this was the first Order the Court signed concerning the sale of the properties, a prior order having been submitted, but not signed.

the FCC for transfer of the license, and that,

> [u]pon [c]losing, the Bath Purchase Price shall be directly payable as follows: (1) to the Receiver for unpaid costs/expenses of the Receiver through Closing, not to exceed $5,000…; (2) to Richard A. Foreman Associates, Inc. for brokerage fees in the amount of the greater of: (i) $45,000; or (ii) 5% of the Purchase Price….

Receiver's Motion to Approve Sale and Bidding Procedures ¶ 12, Aug. 9, 2012, ECF No. 67. The terms for sale of the Wellsville station were similar, with a minimum purchase price of $75,000, no more than $500 in expenses for the Receiver, and a brokerage fee amounting to the greater of $5,000 or 5% of the purchase price. *Id*.

The moving papers also described the bid process which the Court sets out in full here:

> 13. To ensure the maximization of sale proceeds for the Radio Stations and assignment of the Leases, the Receiver seeks approval of the following procedures to market and, if necessary, auction the Radio Stations for the highest and best consideration:
>
> a. Upon entry of the Order filed in conjunction with this Motion, the Receiver shall conspicuously post on the broker's website relating to this case (http://rafamedia.com) general details of the proposed sale of the Radio Stations along with the August 31, 2012 deadline for submissions of competing bids for the Radio Stations, and will advertise the sale in general trade media and send direct mailings to industry participants (Exhibit C);
>
> b. The Receiver will promptly distribute to individuals who have expressed, or who, in response to the Receiver's publication of the sale, express, interest in the Radio Stations any available due diligence package, subject to the signing by such individual entity of a confidentiality agreement;
>
> c. Any competing offers for the purchase of the Radio Stations must be on the same terms as set forth in the Agreements, other than the Bath Purchase Price and Wellsville Purchase Price;
>
> d. The Receiver will consider competing bids for either (i) the Bath, NY Radio Stations, (ii) the Wellsville, NY Radio Station, or (iii) all the Radio Stations. The attached Agreements are with the stalking horse bidder. The

> Receiver will conduct a single step sealed bid process and will be accepting bids submitted to him on or before 5:00p.m. Friday, August 31, 2012 and submitted to the Receiver at the following: …
>
> The Receiver will evaluate bids at a minimum of 10% above the stalking horse bids in the Agreements. The stalking horse may increase its bids by a minimum of 5% over the highest offer.
>
> e. The sale of the Radio Stations to the successful bidder will be set for hearing and approval by this Court between September 1, 2012 and September 30, 2012;
>
> f. The Receiver, in his reasonable discretion, may take such other actions as necessary to ensure that the marketing, and sale procedures are in accordance with his duty to maximize the value of the Radio Stations.

*Id.* ¶ 13.

On March 1, 2012, Richard A. Foreman, as Receiver, hired Richard A. Foreman Associates, Incorporated, ("the brokerage firm") to manage the two radio stations at a reduced daily and hourly rate. First Interim Application ¶ 3, Oct. 19, 2012, ECF No. 99. On May 1, 2012, the Receiver entered into a brokerage agreement with the brokerage firm in which the Receiver agreed that the brokerage firm would provide its services to sell the radio stations and earn the following fee: "It is agreed and understood that our commission shall be at the greater of a minimum of $50,000 (fifty thousand dollars) or the rate of 5% (five percent) of the gross purchase price paid by the buying entity." Brokerage Agreement at 1, May 1, 2012 (filed Oct. 19, 2012), ECF No. 99-1. Payment of the commission was to be "at the 'final closing' of the property or upon receipt of funds from the buyer whichever shall first occur." *Id.* at 2.

## DISCUSSION

The Receiver maintains that,

> The brokerage fee became fully due and payable upon the execution of the Assets Purchase Agreement with the "Stalking Horse" bidder. The brokerage fee was not conditioned on the sale of the assets. Further, the brokerage fees were part and parcel of the Asset Purchase Agreement approved by the Court on August 24, 2012.

First Interim Application of Richard A. Foreman as Receiver for Approval of Interim Compensation and Allowance of Additional Compensation and Reimbursement of Expenses ("First Interim Application") ¶ 10, Oct. 19, 2012, ECF No. 99. Defendants, though, contend that neither the terms of the brokerage agreement, nor the terms of the asset purchase agreements, make a brokerage fee "due and payable." Def.s' Mem. of Law at 2, Oct. 22, 2012, ECF No.101. They acknowledge that the law provides that in general, a broker may earn his commission "merely by producing a purchaser who is ready, willing, and able to buy on the terms and conditions fixed by the seller, even if there is no closing." *Id.* at 2. However, they maintain that the agreements involved in this case conditioned the broker's commission on (1) the Court's approval of the purchase agreements, and (2) a closing. Further, they argue that the broker knew, or should have known, that Defendants could defeat the sale at any time by satisfying the judgment prior to the sale.

The language from the purchase agreement with regard to the Bath radio stations, Ex. A, ECF No. 67, offers the following with regard to the broker's commission:

> 2.1 Purchase Price and Payment.
>
> (a) The purchase price for the Station Assets shall be **FIVE HUNDRED AND TEN THOUSAND DOLLARS ($510,000.00)** (the "Purchase Price") which shall be due and payable at the Closing via a wire transfer of immediately available funds in currency of the United States to the parties and in the amounts set forth in Section 2.1 (b). Contemporaneously with the execution of this Agreement, Buyer shall deliver to Francis J. Browne ("Escrow Agent") 8.33 percent of the Purchase Price ("Escrow Deposit"), which shall be governed by the terms of an escrow agreement to be entered into by Buyer, Seller, and the Escrow Agent coincident with the execution and delivery of this Agreement. The Escrow Deposit shall be credited towards the Purchase Price, and shall be governed by the terms of an escrow agreement.
>
> (b) Upon Closing, the Purchase Price shall be directly payable as follows:
>
> (1) to the Receiver for unpaid costs/expenses of the Receiver through Closing, not to exceed $5,000 ("Receiver Expenses");
>
> (2) to Richard A. Foreman Associates, Inc. for brokerage fees in the amount of the greater of: (i) $45,000; or (ii) 5% of the Purchase Price ("Broker Fee");….

Asset Purchase Agreement ¶ 2.1(a) & (b)(1)–(2), Ex. A, ECF No. 67. The language from the asset purchase agreement for the Wellsville station contains similar language:

> 2.1 Purchase Price and Payment.
>
> (a) The purchase price for the Station Assets shall be **SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00)** (the "Purchase Price") which shall be due and payable at the Closing via a wire transfer of immediately available funds in currency of the United States to the parties and in the amounts set forth in Section 2.1 (b). Contemporaneously with the execution of this Agreement. Buyer shall deliver to Francis J. Browne ("Escrow Agent") 10 percent of the Purchase Price ("Escrow Deposit"), which shall be governed by the terms of an escrow agreement to be entered into by Buyer, Seller, and the Escrow Agent coincident with the execution and delivery of this Agreement. The Escrow Deposit shall be credited towards the Purchase Price, and shall be governed by the terms of an escrow agreement.
>
> (b) Upon Closing, the Purchase Price shall be directly payable as follows:

(1) to the Receiver for unpaid costs/expenses of the Receiver through Closing, not to exceed $500 ("Receiver Expenses");

(2) to Richard A. Foreman Associates, Inc. for brokerage fees in the amount of the greater of: (i) $5,000; or (ii) 5% of the Purchase Price ("Broker Fee");….

Asset Purchase Agreement ¶ 2.1(a) & (b)(1)–(2), Exhibit B, ECF No. 67.

Both asset purchase agreements stated that the amounts set out for the purchase were "due and payable at the closing." It is clear to the Court that the two agreements proposed by the Receiver, which the Court approved, conditioned the brokerage fee upon the closing by using the language, "*due* and payable" upon the closing. *Corcoran Group, Inc. v. Morris*, 107 A.D.2d 622, 623 (N.Y. App. Div. 1st Dep't 1985) ("where the parties agree that a commission will be due and payable only 'if, as and when title actually closes', the broker's entitlement to a commission is contingent upon the actual closing…"). Consequently, the Receiver is not entitled to the brokerage commissions as set forth in the two asset purchase agreements.

Next, the Court reviews the brokerage agreement. Letter from Richard A. Forman Assoc., Inc., to Richard A. Foreman, Receiver (May 1, 2012), attached to First Interim Application, ECF No. 99-1 ("Brokerage Agreement"). That agreement conditioned the Receiver's liability for a brokerage fee on the following conditions:

> If during our period of exclusivity any buyer agrees to purchase the stations (in whole or in part) at any price acceptable for you, you agree to commission us as broker in this transaction. Further if any buyer prospect presented any station by us during this period, within twelve (12) months enters into a definitive purchase agreement to purchase the station(s), you agree to pay our commission.

* * *

> Our commission will be paid by you at the final "closing" of the property or upon receipt of funds from the buyer whichever shall first occur.

Brokerage Agreement at 1–2. The brokerage agreement conditioned liability for a brokerage fee on entry "into a definitive purchase agreement...." The Receiver alleges that the Stalking Horse bidder did enter into an agreement to purchase the radio stations as part of the bidding process approved by the Court.

Defendants rely in part on *Brazilian Inv. Advisory Services, Ltda. v. United Merchants & Mfrs., Inc.*, 123 F.R.D. 477 (S.D.N.Y. 1989). That case is distinguishable since there, the liability for a brokerage fee was conditioned upon a sale and, as the Court noted, "[t]he complaint nowhere alleges that BIAS was entitled to a commission merely upon producing a buyer 'ready, willing, and able' to purchase some or all of Sudamtex." *Id*. at 479. Instead, the brokerage agreement here fits more closely with the one in *Lane-Real Estate Dep't Store, Inc. v. Lawlet Corp.*, 28 N.Y.2d 36 (1971), also cited by Defendants. In that case, the New York Court of Appeals held that,

> it is a well-settled rule in this State that in the absence of an agreement to the contrary, a real estate broker will be deemed to have earned his commission when he produces a buyer who is ready, willing and able to purchase at the terms set by the seller....

*Id*. at 42 (citations omitted). The Court of Appeals stated in an earlier case that, "[t]he broker's ultimate right to compensation has never been held to be dependent upon the performance of the realty contract or the receipt by the seller of the selling price unless the brokerage agreement with the vendor specifically so conditioned payment." *Hecht v. Meller*, 23 N.Y.2d 301, 305 (1968); *see also Geller v. New England Industries, Inc.*, 535

F.2d 1381, 1385 (2d Cir. 1976) ("It matters not that the contract is unenforceable (by virtue of a defect of title) or not completed (by virtue of one party's nonperformance). A broker's right to compensation is not dependent upon performance of the realty contract or receipt of the selling price by the seller unless such a condition is made part of the brokerage agreement."); *compare Corcoran Group, Inc. v. Morris,* 107 A.D.2d 622, 623 (N.Y. App. Div. 1st Dept. 1985) ("However, where the parties agree that a commission will be due and payable only 'if, as and when title actually closes,' the broker's entitlement to a commission is contingent upon the actual closing….").

The brokerage agreement at issue in this case sets two dates. One is the date when liability attaches, measured by when a buyer enters into a definitive purchase agreement. The second is the date when actual payment is made, set by the date of the closing. Defendants evidently conjoin the two provisions to conclude that liability and payment were not due until there was a closing. That interpretation, however, is not supported by the plain language of the brokerage agreement.

Nevertheless, the brokerage agreement does condition the Receiver's liability for a brokerage fee upon entry into "a definitive purchase agreement." The asset purchase agreements here condition their validity upon "approval by the Court…." Asset Purchase Agreement ¶ 8.1. No such approval was ever given. Consequently, the Court finds that no buyer entered into a definitive purchase agreement with the Receiver. Therefore, the Receiver was not liable for a brokerage fee.

Because the Court has decided that the language in the asset purchase agreements and the brokerage agreement precludes payment of a brokerage fee, it does not address Defendants' argument that the brokerage firm was fully compensated for its efforts to find a buyer for the stations through the expenses allowed to the Receiver by the Court's appointing order.

With regard to the Receiver's other expenses as reported by him, Defendants have raised no opposition, but oppose additional argument. Hill Decl. ¶¶ 3, 5. In a Reply filed on May 30, 2013, ECF No. 124, counsel for the Receiver repeated his arguments in support of the allowance of a brokerage fee, which the Court has addressed, above.

One further complication has arisen since the motions at issue. On June 5, 2013, the Clerk of Court received a Sheriff's Notice of Levy and Demand pursuant to New York Civil Procedure Law and Rule § 5232, dated June 4, 2013. Attached to the Notice was an Execution with Notice to Garnishee, demanding payment of $50,551.76 out of the $400,000 on deposit with the Clerk. Therefore, the Court will set a schedule for briefing the issue this Notice raises: is the Court required to direct the Clerk to pay $50,551,76 of the money to the Sheriff?

Accordingly, it is hereby

ORDERED, that the Receiver's motions, ECF Nos. 99 & 121, seeking payment of the brokerage fee, are denied; and it is further

ORDERED, that in all other respects, the Receiver's motions, ECF Nos. 99 & 121, are granted; and it is further

ORDERED, that the Parties address any issues raised by the Sheriff's Notice of Levy and Demand dated June 4, 2013, a copy of which has already been provided by the Court to all parties.

IT IS SO ORDERED.

Dated: June 25, 2013
Rochester, New York

ENTER: /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge